**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ROLAND HOLMES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:11-CV-2634-G (BH)** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed March 8, 2012 (doc. 23) and *Defendant's Motion for Summary Judgment*, filed April 6, 2012 (doc. 24).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motions should be **DENIED**, Defendant's motion should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

**I.  BACKGROUND[1]**

**A.    Procedural History**

Roland Holmes (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability benefits under Title II of the Social

_____

[1]    The background information comes from the record of the administrative proceedings, which is designated as "R."

- 1 -

Security Act.  (R. at 7–9.)  Plaintiff applied for disability insurance benefits on January 12, 2009, alleging disability beginning December 31, 2004, due to severe depression, a bulging disc, kidney stones, and social disorder.  (R. at 10, 118.)  His application was denied initially and upon reconsideration.  (R. at 10, 74–76.)  He timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on February 3, 2010.  (R. at 10, 26–48.)  On July 7, 2010, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 10–20.)  The Appeals Council denied Plaintiff's request for review on August 10, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 1–9.)  He timely appealed to the United States District Court under 42 U.S.C. § 405(g).  (doc. 22.)

B.    **Factual History**

    1.    **Age, Education, and Work Experience**

Plaintiff was born on April 3, 1955.  (R. at 20, 27.)  At the time of the hearing before the ALJ, he was 54 years old.  (R. at 27.)  He graduated high school and enrolled in a course in jewelry repair, but did not complete it.  (*Id.*)  His past relevant work experience includes employment as a pizza delivery driver, a tow-truck driver, and a wastewater treatment plant worker.  (R. at 46.)

    2.    **Medical, Psychological, and Psychiatric Evidence**

        a.    *Medical Evidence*

On January 3, 2007, Plaintiff presented to the Presbyterian Hospital of Greenville emergency room (Presbyterian), complaining of a cough, severe sinus pain and pressure, and a fever.  (R. at 185.)  He described his symptoms as "moderate" but constant, and reported smoking one pack of cigarettes per day.  (*Id.*)  Kristi Pollard, N.P., the treating physician, found he was in "[n]o acute distress," and he had  "a low grade fever" and mild, generalized muscle aches.  (R. at 185.)  She

diagnosed him with "acute bronchitis" and "acute sinusitis" and prescribed him medication. (R. at 185–86.) Finding his condition "good and stable," she discharged him with instructions to drink plenty of fluids and to "not smoke." (R. at 186.)

On December 6, 2007, Plaintiff was seen by Dr. Lynn Rea at Presbyterian for complaints of a back injury that occurred at home two days earlier. (R. at 182.) His pain was "sharp" and "severe" and radiated from his lower back to his right hip and thigh. (*Id.*) It was noted that he was a smoker, but he did not have a history of alcohol or drug use. (*Id.*) Dr. Rea found Plaintiff was alert but in "moderate distress;" his mood, affect, and reflexes were normal; he showed no signs of motor or sensory deficits; and his extremities had a normal range of motion. (R. at 183.) She prescribed him pain medication and instructed him not to return to work for three days, to limit lifting and strenuous activity, and to engage in "[g]entle exercise like walking and gentle stretching." (*Id.*)

On May 4, 2008, Plaintiff presented to Greenville Community Health Service Agency (GCHSA) because he had mouth sores and "swollen [throat] glands." (R. at 189.) The diagnosis was "oral cellulitis and acute lymphargitis." (R. at 190.) He returned on May 21, 2008 for laboratory testing, was diagnosed with tooth pain and increased blood glucose, and was referred to a dentist. (R. at 241.)

On August 29, 2008, Plaintiff returned to GCHSA for a three-month check-up. (R. at 240.) The examining physician diagnosed him with "hyperlipidemia" and lower back pain. (*Id.*) During a follow-up consultation on September 5, 2008, he told the doctor that he had difficulty sleeping and maintaining proper hygiene, had experienced suicidal thoughts in the past and was "imprisoned for it," and he "need[ed] to talk to someone about getting on some anti-depression medicine." (R. at 239.) The doctor diagnosed Plaintiff with depression, lower back pain, and insomnia, and he

prescribed him medication and referred him to a mental health clinic.  (*Id.*)  He returned after two weeks and was diagnosed with anxiety, insomnia, hypertension, back pain, hyperlidipemia, and increased blood glucose.  (R. at 238.)  This time, he asked for a different pain medication because his current medicine was "too expensive."  (*Id.*)

On October 11, 2008, Paul Grant, M.D. examined Plaintiff at Presbyterian for "flank pain" that radiated to his right groin.  (R. at 191.)  Although Plaintiff was alert and well-oriented, he appeared to be in pain and mild distress.  (R. at 192.)  An abdominal CT scan revealed he had "[m]ultiple urinary calculi" in his right kidney, but there were no signs of diverticulitis, hydronephrosis, or diverticulosis.  (*Id.*)  Images of his liver, spleen, pancreas, and adrenal glands were "unremarkable," but it was noted that he had "mild degenerative changes" in his thoracolumbar spine.  (R. at 201.)  Dr. Grant diagnosed him with a urinary tract infection and renal colic, prescribed him medication, and instructed him to drink plenty of fluids and avoid caffeine.  (R. at 196.)

On October 20, 2008, Plaintiff returned to GCHSA because he had pain and a "burning sensation" that radiated from his lower back throughout his leg, and it "hurt[] to ambulate."  (R. at 237.)  The doctor diagnosed him with lumbar radiculopathy, a urinary tract infection, hypertension, and increased lipids and glucose in his blood.  (*Id.*)  He returned in February 2009, complaining that his back pain was not improving, and his pain medication did not work and made him sleepy.  (R. at 235.)

On October 24, 2008, X-rays and an MRI were taken of Plaintiff's lumbar spine.  (R. at 197–99.)  The X-ray impressions showed that his "lumbar segmentation, alignment, and curvature" were normal, his joints were "well aligned" with only minimal facet hypertrophy at L5-S1, and he had "mild bone demineralization" and mild degenerative changes. (*Id.*)  There was no evidence of

destructive lesions, fractures, or subluxation. (*Id.*) The MIR impressions revealed "straightening of lumbar lordosis," "diminished signal in the L1-2, L2-3, L4-5, and L5-S1 discs," and a "[s]mall anterior osteophyte at L2-3." (R. at 199.) Plaintiff's spine alignment, lumbar segmentation, and marrow signal were normal, his spinal cord had normal configuration, his facet joints were "well aligned," and he had no disc herniation or central or neuroforaminal stenosis. (*Id.*)

On March 13, 2009, Eugenia Goodman, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity (RFC) Assessment. (R. at 261.) After reviewing Plaintiff's medical evidence, she opined he had the following physical RFC: lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight; frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently balance, kneel, and crawl; occasionally stoop and crouch; and no manipulative, visual, communicative, or environmental limitations. (R. at 262–65.) She opined that his "functional limitations and symptoms [were] not fully supported by [the evidence of record]." (R. at 266.)

### b. *Psychological and Psychiatric Evidence*

On November 13, 2008, upon a referral from GCHSA, Plaintiff presented to Lakes Regional MHMR Center (MHMR) for a psychological assessment. (R. at 203–210.) Kimberly Snell, L.P.C., a licensed clinician, diagnosed him with major depression disorder. (R. at 208.) He returned to MHMR for a second evaluation on December 11, 2008, and Rodney Ryder, L.P.C., another clinician, likewise diagnosed him with major depression disorder. (R. at 211–18.)

On February 6, 2009, Dr. Arleta Brown, a psychiatrist at MHMR, conducted a Psychiatric Evaluation of Plaintiff. (R. at 219.) Plaintiff reported that he lived with his sister and his disabled

parents.  (*Id.*)  He had a nine-year old daughter whom he did not see, and his ex-wife frequently emailed him "demanding child support."  (*Id.*)  He took Zoloft because he was depressed, he often felt agitated and became easily frustrated, and he hit his sister "when she threw a spoon at him." (*Id.*)  Although his frustration could escalate into "rages," he had "learned to walk away when upset, ... kn[ew] how to cool off, [and] prefer[red] to avoid people."  (*Id.*)  Plaintiff had been charged with "indecent exposure with a child" in 1993, and although he obtained "deferred adjudication," that was still a source of frustration because he had to register as a sex offender and "live[d] next to a police officer."  (*Id.*)  He injured his back in a car accident in 1996, and could not sleep due to his chronic back pain.  (*Id.*)  His appetite, memory, and concentration were poor.  (*Id.*)  He was prescribed Paxil at Glen Oaks but stopped taking it because he could not afford it, and he was currently "trying to get mental disability."  (*Id.*)

Dr. Brown found that Plaintiff appeared to be sad and in poor hygiene; his affect and speech were appropriate; he was oriented to "time, place, person, and situation;" his insight and judgment were good and he had no delusions or suicidal ideations; and he was of "normal intelligence."  (R. at 222–23.)  Although he was "motivated for treatment," he was withdrawn and in "poor health." (R. at 223.)  On a 10-point scale, he rated his depression at 7, his irritability and agitation at 9, his anxiety at 10, and his level of interest at 8.  (R. at 225.)  Dr. Brown increased the dosage of his antidepressant, prescribed him a "low dose of Elavil for sleep and pain," and instructed him to return in four weeks for a follow-up consultation.  (R. at 225–26.)

On March 13, 2009, Mehdi Sharifian, M.D., a state agency psychological consultant, reviewed the evidence of record and completed a Psychiatric Review Technique Form (PRTF).  (R. at 247–59.)  First, he compared Plaintiff's mental impairment to "listing 12.04" for "affective

disorders" and identified it as "depressive syndrome," characterized by appetite and sleep disturbance and difficulty concentrating. (R. at 250.) He next opined that Plaintiff had a mild restriction in his activities of daily living; moderate restrictions in maintaining social functioning and concentration, persistence, or pace; and he had not experienced any episodes of decompensation. (R. at 257.) He noted that Plaintiff was his parents' primary caretaker, was independent for self care, cooked, shopped, handled his parents' and his own finances, did laundry and yardwork, drove, and enjoyed working on cars and going to Wal-mart as past-times. (R. at 259.) He also noted Plaintiff's statements that he did not get along well with others and had "problems concentrating, and remembering things." (*Id.*) He referenced Dr. Brown's observations from February 6, 2009, that Plaintiff had appropriate affect, poor hygiene, decreased motor activity, withdrawn behavior, normal speech, thought content, and intellect, good insight and judgment, and had no delusions. (*Id.*)

Dr. Sharifian also completed a Mental RFC Assessment. (R. at 269–72.) He determined that Plaintiff had no significant limitations in 10 work-related mental areas, including the ability to understand, remember, and carry out very short and simple instructions. (R. at 269–270.) He found that Plaintiff had moderate limitations in 10 areas, including the ability to understand, remember, and carry out detailed instructions, and determined that he did not have a marked limitation in any area. (*Id.*) He opined that Plaintiff was "able to understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes." (R. at 271.) He concluded that Plaintiff's "symptoms and functional limitations [were] not wholly supported by the [evidence of record]." (*Id.*)

On April 20, 2009, Plaintiff returned to MHMR for a "medication check." (R. at 273–78.) He told Glenda Callan, a counselor, that his pain medication was "over-sedating" and requested a

lower dose. (R. at 274.) Counselor Callan diagnosed him with major depression disorder and noted that he suffered from economic and "other psycho-social" problems. (R. at 275.)

On June 3, 2009, Plaintiff's last visit to MHMR on file, he reported feeling depressed and hearing voices at night, and being "unhappy" because his application for social security disability benefits was denied. (R. at 284.) On a 10-point scale, he rated his depression, agitation, and overall functioning at 5, and his irritability, anxiety, level of interest, appetite, and energy level at 4. (R. at 285.) Dr. Brown assigned him a Global Assessment of Functioning (GAF) score of 46,[2] increased the dosage of his anti-depressant, and prescribed him Elavil "to gain better control of [his] back pain so he [could] sleep and hopefully not be as depressed." (R. at 289–90.)

### 3. Hearing Testimony

On February 3, 2010, Plaintiff and a vocational expert testified at a hearing before the ALJ. (R. at 24–48.) Plaintiff was represented by an attorney. (*See id.*)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was 54 years old, divorced since 2009, and currently living with his mother. (R. at 27, 31–32.) He completed the 12th grade and enrolled in a vocational training course in jewelry repair, but he only completed one semester because his hands "shook too much." (R. at 27.) His last job was as a tow-truck driver, and he held it for about eight or nine months. (R. at 28.) Before that, he worked cooking and delivering pizza, a wastewater worker for the City of Greenville for about three years, and as a janitor. (R. at 27–28.)

---

[2] A GAF score of 41 to 50 indicates serious symptoms, such as suicidal ideations, or "any serious impairment in social, occupational, or school functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

In response to the ALJ's question, Plaintiff testified he became disabled on January 31, 2004[3] because he suffered a back injury that required surgery, but "the surgery just didn't hold up," and his pain culminated on that date. (R. at 29.) He was terminated from his job as a tow-truck driver because he "came up short on [his] petty cash" and his "books didn't match up." (*Id.*) He did not seek unemployment benefits and instead he applied for a job delivering pizzas. (R. at 30.)

Plaintiff had not been hospitalized or undergone any surgeries since he was terminated. (*Id.*) He did not receive physical therapy, but took only pain medication. (*Id.*) He weighed 174 pounds, was five feet and eight inches tall, and was right-handed. (R. at 31.) He lost his medical insurance when he stopped working and went to a clinic, where he paid on a "sliding scale." (R. at 32.)

Plaintiff had a commercial driver's license with no restrictions aside from glasses, owned a 1988 Chevrolet pickup truck, and had a personal bank account. (R. at 33–34.) He did not attend church or participate in any social groups or events, and he did not go anywhere unless he had to. (R. at 33.) He operated a car-repair shop in his mother's barn and fixed his relatives' cars there until the barn was blown away. (R. at 34.) He did household chores, including cooking, putting dishes in the dishwasher, laundry, and occasionally taking out the trash, and he took care of his three cats. (R. at 35.)

In response to counsel's questions, Plaintiff testified that he went to GCHSA to receive treatment for his lower-back pain, arthritis, and most recently, his depression. (R. at 36.) After he underwent an MRI, the doctors told him he had a bulged disc. (R. at 37.) His parents had to pay for his Hydrocodone and Meloxicam, which he took for arthritis. (*Id.*) These medications affected

---

[3] At the hearing, the ALJ stated that Plaintiff's date of disability was January 31, 2004, but his decision and Plaintiff's application identify December 31, 2004 as the disability onset date. (*See* R. at 10, 12, 20, 118.)

his ability to concentrate, and he didn't drive when he took them. (*Id.*) The Risperidone and Resbuterol that he took for his pain made him drowsy and lethargic. (R. at 38.) When he took these medications, he slept for 12 hours straight, and he often took a one and a halfhour nap during the day for his pain. (R. at 38–39.) He also took Zoloft regularly and Tramadol occasionally for his depression. (R. at 39.)

Plaintiff went to MHMR because he was depressed, had difficulty sleeping, heard voices and saw things, and was "easily startled." (*Id.*) When he took his medication, he heard the voices about once a week. (R. at 40.) He had suicidal thoughts almost weekly, and reported them to his clinicians at MHMR. (*Id.*) Although he had experienced thoughts of harming others in the past, and had even assaulted some family members, he believed that his medication and his "seclusion" were helping him control those impulses. (*Id.*)

Plaintiff was committed to "Glen Oaks" for two and a half weeks in 1993 because he was depressed and suffered from suicidal and homicidal ideations. (R. at 41.) Even though his medications were currently controlling his symptoms, he still "would be scared to go out in public" because he was "very irritable" and afraid that he might "punch [someone] in the head like [he] did his sister." (R. at 42.) He never visited anyone and did not participate in any social activities. (*Id.*) He drove himself to the doctor, and his nephew drove him to the hearing that day. (R. at 42–43.)

Plaintiff could not "open bottles and squeeze down on anything because it hurt[]" due to his arthritis. (R. at 43.) Additionally, his doctors diagnosed him with high cholesterol and tried to control it through diet because he had an adverse reaction to medication. (*Id.*) In response to counsel's question regarding his mental condition, he explained that "[e]ven if [he] was physically able to work, [he] wouldn't be employable because ... [he] wound up getting a[n] indecency with

child charge and ... nobody [would] hire [him]." (R. at 44.)

### b.    *Vocational Expert testimony*

A vocational expert (VE) also testified at the hearing. (R. at 45–48.) The VE testified that Plaintiff's past relevant work history included jobs as a pizza delivery driver (medium, SVP-2), a tow-truck driver (medium, SVP-3), and a wastewater treatment plant worker (medium, SVP-4). (R. at 46.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work with the following limitations: the ability to perform medium work, and occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, sit, and walk for at least six hours in an eight-hour workday; no push-pull limitations; occasionally stoop and crouch; frequently climb, balance, kneel, and crawl; never use ladders, ropes, or scaffolds; and from a mental standpoint (mildly to moderately affected), the ability to learn, understand, remember, and carry out detailed but not complex instructions and tasks; use judgment in making work-related decisions; respond and relate appropriately to others, such as supervisors and co-workers; maintain attention and concentration for at least two-hour intervals; and deal with changes in work settings and environments. (R. at 47.) The VE testified that the hypothetical person could perform Plaintiff's past relevant work as a pizza delivery driver and a wastewater treatment plant worker. (*Id.*)

In response to counsel's questions, the VE testified that a hypothetical individual who was unable to complete a workday because of interruptions caused by "psychologically-based symptoms" would not be competitively employable. (*Id.*) Likewise, a hypothetical individual who was required to take an unscheduled, one and a half-hour rest break during the day would not be competitively employable. (*Id.*) Lastly, she testified that a person who missed as many as 18 days

of work per year would not be competitively employable.  (R. at 47–48.)

## C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on July 7, 2010.  (R. at 10–20).  At step one, he found that Plaintiff met the insured status requirements through December 31, 2009, and had not engaged in substantial gainful activity since his alleged onset date of December 31, 2004.  (R. at 12.) At step two, he found that Plaintiff had two severe impairments: mild lumbar degenerative disk disease and history of kidney stones.  (*Id.*)  At step three, he found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations.   (*Id.*)

Next, the ALJ determined that Plaintiff had the RFC to perform medium work with the following physical limitations: lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and walk for about six hours in an eight-hour workday; no limitations in pushing or pulling with his upper and lower extremities, including the operation of foot controls; frequently balance, kneel, crawl, climb stairs and ramps; occasionally stoop and crouch, but never climb ladders, ropes, or scaffolds; and no manipulative, visual, communicative, or environmental limitations.  (R. at 14–15.)  From a mental standpoint, he found that Plaintiff had the ability to learn, understand, remember, and carry out detailed, but not complex, instructions and tasks; use judgment in making work-related decisions; respond and relate appropriately to others, such as supervisors and co-workers; maintain attention and concentration for at least two-hour intervals; and adapt to and deal with changes in work settings and environments.  (R. at 15.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a pizza delivery driver and a waste water treatment plant worker, but he could

not perform his past relevant work as a tow-truck driver because it exceeded his RFC. (R. at 19.) Accordingly, he determined that Plaintiff was not disabled at any time between his alleged onset date of December 31, 2004 and the date of the ALJ's decision. (R. at 20.)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. 42 U.S.C. § 405(g), 1383(C)(3); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income.  *See id.*  The Court

may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id.*

###    2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as

defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638,

640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.

Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents the following issues for review:

(1)     Whether the ALJ Erred in Not Finding Plaintiff's Major Depression Disorder to be a Severe Impairment and

(2)     Whether the ALJ's RFC is Supported by Substantial Evidence.

(Pl. Br. at 1.)

**C.     Severity of Plaintiff's Mental Impairment**

Plaintiff argues that the ALJ erred in not finding that his major depression disorder was a severe mental impairment. (Pl. Br. at 4–5.) He contends that the ALJ misapplied the "psychiatric review technique" and utilized an improper severity standard when he evaluated the severity of his mental impairment at step two. (*See id.*)

1.      **Severity Standard**[4]

Plaintiff argues that remand is required because, the ALJ used an incorrect severity standard at step two despite citing *Stone*.  (Pl. Br. at 5.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (2012).  Finding that a literal application of this regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985).  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id.* at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) [(2012)] is used."  *Id.* at 1106; *accord Loza*, 219 F.3d at 393.  Notwithstanding this presumption, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard.  *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th

---

[4]  Although briefed as the second part of his first issue, Plaintiff's contention that the ALJ used an incorrect severity standard is discussed first because the definition of "severity" used by the ALJ at step two directly impacts the disability analysis in the remaining steps.  *See Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).

Cir. 1986). Unless the correct standard is used, the claim must be remanded for reconsideration. *Stone*, 752 F.2d at 1106.

Here, citing *Stone*, the ALJ stated that "[a]n impairment or combination of impairments is 'not severe' only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." (R. at 11.) However, after using the "magic words," he stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits his ability to perform basic work activities." (*Id.*) (implicitly citing to 20 C.F.R. § 404.1520(c)). Unlike the ALJ's second articulation, *Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work. The difference between these two constructions, coupled with the ALJ's failure to specify which of the two he applied, compel the conclusion that he applied an incorrect standard of severity. *See Neal v. Comm. of Social Sec. Admin.,* No. 3–09–CV–0522–N, 2009 WL 3856662 at * 1 (N.D. Tex. Nov.16, 2009) ("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone,* without more, conclusively demonstrates that he applied the correct standard."); *see also Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the regulatory definition of severity that the ALJ cited in this case).

Courts in this district have recently held that *Stone* error does not mandate automatic reversal and remand, and application of the harmless-error analysis is appropriate, in cases where the ALJ proceeds past step two in the sequential evaluation process. *See, e.g.*, *Hall v. Astrue*, No. 3:11-CV-

1929-BH, 2012 WL 4167637, at *11 (N.D. Tex. Sept. 20, 2012); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011). For "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, *without consideration of the remaining steps in the sequential analysis*, claims of those whose impairment is more than a slight abnormality." *Anthony*, 954 F.2d at 294 (emphasis added).

In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Here, the ALJ found at step two that Plaintiff had two severe impairments: mild lumbar degenerative disc disease and history of kidney stones. (R. at 12.) After step three, he determined that Plaintiff had the RFC to perform medium work with several physical and mental limitations. (R. at 14–15.)

In assessing Plaintiff's RFC, the ALJ explained that he reviewed and considered all of the evidence, as well as all of Plaintiff's "allegations ... and subjective complaints." (R. at 17–18.) Consideration of all "medically determinable impairments ... including [those] that are not 'severe'" is required by the regulations when determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(2). He acknowledged Plaintiff's statements that his "severe depression ... and social disorder limit[ed] his ability to work," "he [did] not want to get out of the house unless he ha[d] to, and he ha[d] difficulty concentrating and remembering job instructions." (R. at 16.) However, he discounted Plaintiff's allegations as "neither entirely credible, nor consistent with or supported by the preponderance of the medical and other evidence of record." (R. at 17.)

The ALJ then proceeded to step four and concluded that considering Plaintiff's age, education, work experience, and RFC, he could return to his past relevant work as a pizza delivery

driver and a waste water treatment plant worker. (R. at 19.) He considered the effects of Plaintiff's mental impairment, combined with the effects of his physical impairments, and concluded that he had the RFC to perform substantial gainful activity. (*See* R. at 14–19.) Although he did not explicitly find that Plaintiff's major depression disorder was a severe impairment, he still considered its effects on his ability to work as required by the regulations. The *Stone* error was harmless because it is inconceivable that the ALJ would have assessed a different RFC—and thereby reached a different disability determination at step four—if he had applied the *Stone* severity standard at step two. Remand is therefore not required on this ground.

### 2. Psychiatric Review Technique

Plaintiff argues, in essence, that the ALJ misapplied the psychiatric review technique because he failed to find that his major depression disorder was a severe mental impairment, despite his findings that Plaintiff had moderate difficulties in two functional areas: social functioning and concentration, persistence, or pace. (Pl. Br. at 4–5.)

In addition to the severity standard that is used to evaluate all impairments, the Social Security Regulations provide even more precise standards to evaluate the severity of a claimant's mental impairments. *See* 20 C.F.R. § 404.1520a. The evaluation process is often referred to as "the technique" or the "special technique." *Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012), *report and recommendation adopted*, 2012 WL 6553829 (N.D. Tex. Dec. 13, 2012) (citing to 20 C.F.R. § 404.1520a). Specifically, once the ALJ finds that a claimant has a mental impairment, he "must then evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)). These functional areas are: (1) activities

of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.[5]   20 C.F.R. § 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.

After rating the degree of functional limitation, the ALJ determines the severity of the mental impairment.  20 C.F.R. § 404.1520a(d).  If the degrees of limitation in the first three areas are "none" or "mild," and the degree of limitation in the fourth area is "none," "the ALJ must find the impairment 'not severe,' which generally concludes the analysis and terminates the proceedings." *Boyd*, 239 F.3d at 705 (citing to 20 C.F.R. § 404.1520a(d)(1)).  If the ALJ finds that the mental impairment is severe at step two, he must determine at step three if it meets or medically equals a listed impairment.  20 C.F.R. § 404.1520a(d)(2).  If the impairment does not meet or equal a listed impairment, the ALJ must conduct an RFC assessment.  *Id.* § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705.  "The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described."  *Westover*, 2012 WL 6553102, at *8 (citing 20 C.F.R. § 404.1520a(e)(4)).

When analyzing the severity of Plaintiff's major depression disorder at step two, the ALJ "relied upon" Dr. Sharifian's PRTF, and found that Plaintiff had a "mild restriction" in activities of daily living, "moderate difficulties" in social functioning and concentration, persistence, or pace, and "had experienced no prior episodes of decompensation."  (R. at 13.)  At step three, he considered the criteria of paragraphs B and C to determine whether Plaintiff's impairment met or

---

[5]  These four functional areas are known as the "paragraph B criteria."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  The first three are rated on a five-point scale, as either none, mild, moderate, marked, or extreme, and the fourth is rated on a four-point scale, ranging from "none" to "four or more episodes."  *See* 20 C.F.R. § 404.1520a(c)(4).

medically equaled the criteria of listing 12.04 for affective disorders, and concluded that it did not. (*See* R. at 12–14.)  He next assessed Plaintiff's RFC.  (*See* R. at 14–19.)

Even though the ALJ did not explicitly find Plaintiff's major depression disorder to be a severe mental impairment at step two, he treated it as if it were by comparing it to the relevant listed impairment at step three.  (*See* R. at 13); *see also* 20 C.F.R. § 404.1520a(d)(2) ("If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder.").  Finding that Plaintiff's mental impairment did not meet or equal a listed impairment, the ALJ proceeded to assess his RFC.  Accordingly, Plaintiff's argument that the ALJ misapplied the technique by not finding his major depression disorder to be a severe mental impairment is without support.[6]  Remand is therefore not required on this issue.

## D.     RFC Assessment

Plaintiff last contends that the ALJ's RFC assessment is not supported by substantial evidence because he failed to incorporate all of Plaintiff's functional limitations.  (Pl. Br. at 5–6.)  The Commissioner responds that substantial evidence supports the ALJ's RFC assessment.  (D. Br. at 11–14.)

---

[6] Plaintiff did not cite any cases in the Fifth Circuit that support his proposition that a moderate limitation in two of the first three areas "would result" in a finding of severity.  Even assuming, *arguendo*, that the ALJ misapplied the technique by not explicitly finding that Plaintiff's major depression disorder was a severe impairment, any error was harmless and does not warrant reversal.  In the Fifth Circuit, the "violation of a regulation constitutes error, and will constitute a basis for reversal of agency action and remand when a reviewing court concludes that the error is not harmless."  *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (citation omitted).  Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette*, 466 F. Supp. 2d at 816.  At step three, the ALJ treated Plaintiff's major depression disorder as a severe mental impairment by comparing it to the 12.04 listing.  Moreover, as previously discussed, he considered its effects on Plaintiff's ability to work at step four.  It is inconceivable, therefore, that the ALJ would have reached a different disability determination if he had explicitly found that Plaintiff's major depression disorder was a severe impairment when he applied the technique.

Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Moreover, determining a claimant's mental RFC involves consideration and analysis of the evidence and "draw[ing] meaningful inferences and allow[ing] reasonable conclusions about the individual's strengths and weaknesses." *Cline v. Astrue*, 577 F. Supp. 2d 835, 848 (N.D. Tex. 2008) (citing SSR 85-16 (PPS-120), 1985 WL 56855, at *2 (S.S.A. Nov. 30, 1984)).

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). He may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. However, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the

[Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* Ultimately, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility determination regarding Plaintiff's alleged symptoms and limitations, and evaluating all the evidence of record, the ALJ determined that he had the RFC to perform medium work with the following physical and mental limitations: lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and walk for six hours in an eight-hour workday; no limitations in pushing or pulling with his upper and lower extremities, including the operation of foot controls; frequently balance, kneel, crawl, climb stairs and ramps; occasionally stoop and crouch, but never climb ladders, ropes, or scaffolds; no manipulative, visual, communicative, or environmental limitations; learn, understand, remember, and carry out detailed, but not complex, instructions and tasks; use judgment in making work-related decisions; respond and relate appropriately to others, such as supervisors and co-workers; maintain attention and concentration for at least two-hour intervals; and adapt to and deal with changes in work settings and environments. (R. at 14–15.)

Plaintiff contends the ALJ erred because he found in his technique that Plaintiff had moderate limitations in maintaining social functioning and concentration, persistence, or pace, but he failed to incorporate these limitations into his RFC assessment. (Pl. Br. at 7–8.) The Commissioner responds that the ALJ did not err because he included in his RFC findings all of

Plaintiff's mental limitations that Dr. Sharifian, an "expert" in disability evaluation, found in his PRTF and mental RFC. (D. Br. at 10.)

The limitations identified in paragraph B of the technique "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011) (citing Social Security Ruling (SSR) 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996)). The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the various functions found in paragraphs B and C of the adult mental disorders listings and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *See* SSR 96-8P, 1996 WL 374184 at *4–6. Although the ALJ must consider the claimant's "paragraph B" functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment "word-for-word." *Westover*, 2012 WL 6553102, at *8; *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *20 (N.D. Tex. Feb. 9, 2011).

### 1. Social Functioning

Plaintiff argues that the ALJ's RFC assessment did not reflect his moderate limitation in social functioning because he improperly rejected Plaintiff's GAF score of 46, as well as evidence that he avoided people, became easily agitated and frustrated, and had a history of family violence. (Pl. Br. at 5–6.)

The ALJ adopted Dr. Sharifian's paragraph B findings in his PRTF that Plaintiff was moderately restricted in social functioning, as well as his "expert psychiatric opinion" in his mental

RFC that Plaintiff could "interact with others." (R. at 13, 16, 271.) Accordingly, he determined

that Plaintiff had the mental RFC to respond and relate appropriately to others, such as supervisors

and co-workers. (R. at 15, 16, 271.) He explained that his RFC assessment "reflec[ted] the degree

of limitation [he] found in the 'paragraph B' mental function analysis." (R. at 14.) He noted

Plaintiff's statements to Dr. Brown that he became easily agitated and that his frustration could

escalate into rages. (R. at 14, 219.) Plaintiff also told Dr. Brown that he had learned to walk away

when he was upset and knew how to cool off. (R. at 219.) While the ALJ did not acknowledge Dr.

Brown's GAF score finding, he referenced her notation from an earlier session that Plaintiff was

"trying to get mental disability." (R. at 14, 219.) He also considered Plaintiff's response in his

disability report that "he g[ot] along 'pretty good' with authority figures," and his hearing testimony

that "a combination of medication and seclusion help[ed] him to control his rage." (R. at 17, 143.)

Finally, he found it significant that Plaintiff rated his depression at 3 during a counseling session on

April 20, 2009. (R. at 14, 274.)

The record shows that the ALJ did consider Plaintiff's moderate limitation in social

functioning in assessing his RFC. Because the disability determination falls within the purview of

the ALJ, he could disregard Dr. Brown's GAF score finding[7] and give greater weight to Dr.

Sharifian's RFC assessment if he found it to be better supported by the evidence. *See Barnhart*, 326

F.3d at 620; *see also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) ("[T]he ALJ is free

to reject the opinion of any physician when the evidence supports a contrary conclusion."); 20

---

[7] Because a GAF score is only a diagnostic tool, courts have held that no particular GAF score "necessarily correlates" to specific limitations imposed by a claimant's mental impairments. *See Bobinger v. Astrue*, No. 1:09-CV-103-C, 2011 WL 1085265, at *5 (N.D. Tex. Mar. 24, 2011).

C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Moreover, as the fact-finder, the ALJ had the sole responsibility for determining whether Plaintiff's statements to Dr. Brown regarding his anger, irritability, and need to avoid people conflicted with other statements he made and with other evidence in the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve."). Accordingly, substantial evidence supports the ALJ's RFC finding that Plaintiff could respond and relate appropriately to supervisors and co-workers despite his moderate limitation in social functioning. *See Herring v. Astrue*, 788 F. Supp.2d 513, 523 (N.D. Tex. Apr.22, 2011) (Fitzwater, C.J.) (holding that because the claimant's "social limitations were only moderate, there [was] substantial evidence to support the conclusion that [he] could 'respond appropriately to supervision and coworkers and usual work pressures'").

## 2. *Concentration, Persistence, or Pace*

Plaintiff argues that the ALJ's mental RFC did not incorporate his moderate restriction in maintaining concentration, persistence, or pace, as is evidenced by his rejection of Plaintiff's GAF score and his statements that his medications affected his alertness and concentration. (Pl. Br. at 7–8.) He contends that given his medications' side-effects, the ALJ should have restricted his ability to drive a vehicle or operate machinery. (*Id.* at 8.)

The ALJ adopted Dr. Sharifian's paragraph B finding that Plaintiff was moderately limited in maintaining concentration, persistence, or pace, and also adopted his RFC finding that Plaintiff could understand, remember, and carry out detailed but not complex instructions. (R. at 13, 15, 271.) Notably, while Dr. Sharifian found that Plaintiff could concentrate for extended periods, the

ALJ's RFC assessment was more restricted because he found that Plaintiff could maintain attention and concentration for two-hour intervals.  (R. at 15, 271.)

In determining Plaintiff's RFC, the ALJ found it significant that Plaintiff had not required medical or psychiatric in-patient care and did not seek treatment until 2008, even though his mental and physical impairments allegedly began in 2004.  (R. at 15.)  He acknowledged, but gave less weight, to his statements that he had poor memory and concentration "because of all the thoughts in [his] head."  (R. at 17, 142.)  He noted that Plaintiff "follow[ed] written instructions 'pretty good' and spoken instructions 'not very well,'" and pointed to his statements to physicians and hearing testimony that "he [drove] himself to his doctor's appointments," and that he was unemployable due to his criminal record.  (R. at 13, 17, 42–43, 259.)  Lastly, the ALJ referenced his own observations of Plaintiff's demeanor, behavior, responses, facial expressions, and body dynamics at the hearing.  (R. at 17.)

As required by the regulations, the ALJ also considered "the type and amount of medication" Plaintiff was prescribed, as well his hearing testimony that his medication "[did] not have much effect on his pain, but it [did] affect his concentration," and that he did not drive when he took it.  (R. at 17–18, 38–39, 274.); *see also Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir.1999) (As part of his disability determination, the ALJ is required to consider "the type, dosage, effectiveness, and side effects of any medication" a claimant takes or has taken in order to alleviate his pain and other symptoms.) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).  He determined that Plaintiff's allegations regarding the effects of his medications were neither credible, nor consistent with the objective medical evidence, including Dr. Sharifian's "expert" opinion.  (R. at 18–19.)  In reviewing the

medical evidence and completing his PRTF, Dr. Sharifian noted that Plaintiff drove. (R. at 259.) Plaintiff also testified that he drove himself to his doctors' appointments. (R. at 42–43.)

The record shows that the ALJ considered, and incorporated into his RFC assessment, Plaintiff's moderate limitation in maintaining concentration, persistence, or pace. Nevertheless, because the ALJ is responsible for weighing the evidence, he was free to discount or ignore Plaintiff's GAF score and his subjective complaints regarding his limitations if he found them to be unsupported by the evidence. *See Muse*, 925 F.2d at 790. Ultimately, substantial evidence in the record supports the ALJ's finding that Plaintiff's moderate limitation in maintaining concentration, persistence, or pace restricted his RFC only to the extent that he could concentrate for two-hour intervals and understand, remember, and carry out detailed, but not complex, instructions. *See Westover*, 2012 WL 6553102, at *9 (holding that substantial evidence supported the ALJ's RFC assessment that limited the claimant "to only performing work that involved detailed instructions," despite his moderate limitation in maintaining concentration, persistence, or pace, where the ALJ made that determination "based upon [his] evaluation of the evidence"); *Chadwell v. Astrue*, 4:08-CV-736-Y, 2010 WL 3659050, at *11 (N.D. Tex. May 25, 2010), *report and recommendation adopted*, 2010 WL 3658996 (N.D. Tex. Sept. 17, 2010) (to same effect).

Because substantial evidence supports the ALJ's mental RFC assessment, remand is not required on this issue.

## III.   RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED**, Defendant's motion for summary judgment should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED, on this 25th day of January, 2013.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE